Filed 12/19/24  P. v. Emanuel CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049190 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1246799) |
| v. | |
| LOUIS SANCHEZ EMANUEL, | |
| Defendant and Appellant. | |

In 2015, a jury convicted Louis Sanchez Emanuel and his codefendant, Jacob Craig Whitley, of first degree felony murder (Pen. Code, § 187, subd. (a))[1] and the trial court sentenced Emanuel to a term of 25 years to life.  On direct appeal, another panel of this court reversed Emanuel's sentence and remanded the matter for the trial court to exercise its discretion, specifically to consider whether to instead impose probation with a jail term in excess of one year.  (*People v. Whitley et al.* (Nov. 22, 2019, H043651) [nonpub. opn.], p. 72 (*Whitley*).)  On remand, after rejecting Emanuel's challenge to his sentence as constituting cruel and unusual punishment under the state and federal constitutions, the trial court elected not to impose probation and confirmed that the original sentence of 25 years to life remained in place.

---

[1] Unspecified statutory references are to the Penal Code.

On appeal, Emanuel renews his challenge to his sentence as violating the Eighth Amendment to the U.S. Constitution and article I, section 17 of the California Constitution.

As we explain below, we disagree that Emanuel's sentence amounts to cruel and unusual punishment and will affirm the judgment.[2]

## I. FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. Procedure relating to underlying trial

"On April 15, 2015, the Santa Clara County District Attorney filed a second amended information charging Emanuel and Whitley with one count of first degree

---

[2] We note that Emanuel also devotes a considerable portion of his briefing to contesting the trial court's finding, made following an evidentiary hearing on Emanuel's petition for resentencing pursuant to section 1172.6, that he was a major participant in the offense and acted with reckless indifference to human life. In a separate appeal, this court affirmed the trial court's order denying Emanuel's section 1172.6 petition, concluding that substantial evidence supported the trial court's findings. (*People v. Emanuel* (May 12, 2023, H049147) [nonpub. opn.], review granted Sept. 13, 2023, S280551 (*Emanuel*).) As that decision is currently on review before the California Supreme Court, we lack jurisdiction to address the question and will not discuss it further herein, except to the extent that the underlying facts inform an analysis of whether Emanuel's punishment is disproportionate to his individual culpability.

[3] This court granted Emanuel's request for judicial notice of the trial record and this court's opinion in Emanuel's direct appeal, i.e., *Whitley*, *supra*, H043651, as well as the records in Emanuel's separate appeal from the trial court's denial of his petition for resentencing in *Emanuel*.

Both parties here rely on the record from *Whitley* for a description of the underlying facts and that record also formed the basis for our factual recitation in *Emanuel*. We therefore quote at length from *Emanuel*, as permitted by California Rules of Court, rule 8.1115(b)(1), "to explain the factual background of the case and not as legal authority. [Citation.]" (*Pacific Gas & Electric Co. v. City and County of San Francisco* (2012) 206 Cal.App.4th 897, 907, fn. 10.)

We derive our recitation of the procedural history from the record in the instant case, as well as the records in *Whitley* and *Emanuel*, where appropriate.

murder (§ 187, subd. (a); count 1).[4]  After a trial, a jury convicted both men of first degree felony murder and found true the allegations that Whitley personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)).  In a bifurcated proceeding, the trial court found true Whitley's prior strike conviction and prior serious felony conviction allegations.  The trial court sentenced Emanuel to 25 years to life in prison.[5]"  (*Emanuel*, *supra*, H049147, rev.gr. at p. 2.)

### B. Facts from the underlying trial

#### "1. The prosecution case

"Mansour Amini and John Cody S.[6] were friends who exercised and smoked marijuana together. Cody also sold marijuana to Amini numerous times.

"About two weeks before Cody was shot, Amini was at the community college he attended, when Emanuel and Whitley approached him.  Amini had never seen either man before.[7]  After initially saying they were thinking of enrolling, Emanuel told Amini they were looking to purchase a pound of marijuana.  Amini said he could get that for them, but it would take a couple of weeks.  Amini exchanged phone numbers with Emanuel.

"Emanuel called Amini frequently over the next few days asking about the marijuana.  Amini contacted several people who he thought might be able to supply a

---

[4] "The operative information further alleged that Whitley personally used a firearm in the commission of the offense, resulting in the victim's death, and also that Whitley had a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12) and a prior serious felony conviction (§ 667, subd. (a))."

[5] "The trial court sentenced Whitley to a total term of 80 years to life."

[6] "To protect the victim's privacy, we first refer to him by his given name and the first initial of his surname.  In the rest of the opinion, we refer to the victim as Cody, the name used to identify him at trial.  (See Cal. Rules of Court, rule 8.90(b)(4).)"

[7] "Whitley told Amini his name was 'Louis' although that was Emanuel's first name, and also that Emanuel was his 'cousin.' "

3

pound of marijuana and ultimately Cody said he could get that much for Amini. Cody said that Amini would receive $200 for brokering the deal.

"Amini and Cody met with Emanuel and Whitley at a restaurant to discuss the deal. Amini and Cody showed Emanuel and Whitley a sample of the marijuana. Emanuel took a photo of the sample and said he and Whitley planned to ship the pound of marijuana to their uncle in Las Vegas.

"Emanuel offered to pay either $2,200 or $2,600 for the marijuana. Amini knew 'there was something wrong' because a pound of marijuana sold for around $1,800. Amini and Cody were 'confused' by the offered price, and Amini 'didn't have a good feeling at that time' about the situation.

"Two or three days later, Amini and Cody met with Emanuel and Whitley at the restaurant again. Emanuel and Whitley got into Cody's truck and drove with him and Amini to Cody's supplier's house to pick up the marijuana. When they arrived, Emanuel and Whitley said they did not have the money for the marijuana.

"Emanuel and Whitley asked which house belonged to the supplier, but Cody said the supplier would not meet with them unless they had the money. The men agreed to meet the following day, December 11, at a park to complete the deal.

"On the morning of December 11, Amini and Cody exchanged numerous texts, including several angry messages from Amini when it appeared that Cody was backing out of the deal. Amini received a call from Emanuel and Whitley as well as text messages about doing the deal.

"Cody picked up Amini, and they drove in Cody's truck to the park, arriving around 2:30 p.m. While in the truck, Cody showed Amini the pound of marijuana, packaged in a plastic bag inside a 'Vans' shoebox. Amini called Emanuel's phone and spoke to Whitley, who said they were on their way and were around the corner.

4

"While Amini and Cody were waiting in the truck, they started to argue about when they would smoke marijuana after finishing the deal. Cody suddenly threw Amini's gym bag out of the truck, spilling Amini's marijuana stash. Amini and Cody got out of the truck, and after Cody 'got in [Amini's] face' for about a minute, Cody got in his truck and drove away.

"Amini believed Cody was trying to cut him out of the marijuana deal. Amini called and sent multiple text messages to Cody inquiring about his whereabouts and the $200 he was owed for the deal. Amini also texted and called Emanuel, but there was no response.[8]

"Between 3:00 and 3:20 p.m., a witness heard what she thought was a gunshot, followed by the screeching of tires, and she saw Cody's truck traveling at high speed from one side of the street to the other. Cody 'fell out and rolled down the street and landed in the gutter' before the truck collided with a tree. Another witness came out of her house after hearing screeching tires followed by a loud noise and thought there had been a car accident. She saw Cody's truck on the sidewalk against a tree and Cody face down on the ground, not moving. The witness called 911 and told Cody that she had summoned help. Cody was 'moaning,' but not using words.

"The forensic pathologist testified that Cody died at the scene from a close-range[9] gunshot wound to the right side of his neck that perforated his carotid artery. Cody also had multiple blunt force injuries on his body, including an abrasion on his left forehead and other abrasions and lacerations on his head consistent with being struck by a solid blunt object. Cody would have lost consciousness within minutes of being shot.

---

[8] "Cody texted Emanuel's phone at 2:37 p.m., saying he was 'at the park right now with it. We do this without this fool [Amini]. I'll get you for 21 instead of 22.' "

[9] "Based on the gunpowder stippling on Cody's face, the barrel of the gun was within three feet of his face when it was fired."

5

"Responding officers found blood in the vehicle as well as on the right front tire, wheel well, and front bumper. An accident reconstruction expert opined that, after falling out of the truck, Cody's body was caught underneath it and dragged until it came to rest against the curb. Inside the truck, officers found an unusable amount of marijuana as well as an empty shoebox with the brand name 'Supra.'[10]

"Around the time of the crime, Emanuel had an 'on and off' relationship with Breanna Santos. Santos testified that she recalled being interviewed by police at least twice about the events surrounding the murder in December 2012. Santos, however, repeatedly claimed she could not recall what she said to police or anything that occurred the day of the shooting. Following a hearing outside the presence of the jury, the trial court found that Santos's inability to recall was disingenuous and her testimony was 'evasive to say the least.' The trial court then permitted one of the officers who interviewed Santos, San Jose Police Sergeant Stewart Davies, to testify about her statements during those interviews.

"Sergeant Davies testified that he interviewed Santos twice, once on December 12, 2012 and again on December 14, 2012. Santos initiated the December 12 interview by calling the police and voluntarily showing up at the police station. Santos explained she wanted to talk to the police because a phone registered in her name had been used by Whitley to 'set something up' and the 'text messages . . . would cause the police to come looking for her.'

"During the December 12 interview, Santos told police that, on December 11 (the day of Cody's death), Santos returned to Emanuel's house to pick up their son around 4:00 p.m. Emanuel and Whitley were both there and Santos asked Whitley to return the phone. Whitley told her he had 'shot a white boy' at a park, repeating ' "I shot him" '

_____

[10] "During his testimony, Amini was shown a picture of this shoebox and denied seeing it in Cody's truck that day."

6

three times. According to Santos, Emanuel confirmed that Whitley was telling the truth and had shot somebody.

"Police asked Santos to return for a second interview on December 14. Based on their investigation, the officers believed that Santos had lied about Emanuel not being present at the shooting. At the December 14 interview, the police confronted Santos with phone records, and she admitted that Emanuel had her phone on December 11 and had not loaned it to Whitley on that day. She also said that Emanuel suggested telling police the story about Whitley having the phone.

"Sergeant Davies testified further that, during the December 14 interview, Santos said she returned to Emanuel's house around 5:00 or 5:30 p.m. When she arrived, Whitley and Emanuel were in Emanuel's room and Whitley said, ' "I shot him. I shot him." ' Emanuel told Santos ' "[Whitley] did shoot him," ' and the shooting happened at the park. Santos asked Emanuel what happened, and Emanuel replied, ' "[Whitley] just shot him and then we came home." ' Emanuel also said ' "[t]hat shit was crazy." '

"When Santos asked Whitley why he shot the person, Whitley replied, ' "I don't know. I don't know. I shot him." ' Emanuel told Santos that Whitley ' "had set something up to meet a guy at Cherry Park . . . to get some weed." ' When Cody refused to give them the marijuana, Emanuel told Santos he told Whitley, ' "let's go," ' but Whitley would not walk away. Whitley hit Cody with the gun to get him to let go of the marijuana, and Cody started fighting back. Emanuel told Santos that ' "[Whitley] said he [was] pointing the gun down, he was trying to aim down, but the guy hit his hand, it went up and [Whitley] pulled the trigger and he said he shot him in his neck." '

"Emanuel told Santos that he asked Whitley, ' "What the fuck you doing?" ' After the gun went off, Emanuel 'started panicking,' and he and Whitley went to Emanuel's house. When Santos 'started panicking' about Whitley's and Emanuel's use of the phone

7

that was in her name, Emanuel ' "started crying and saying that, 'I didn't do nothing, though. I didn't do nothing.' " '

"Sergeant Davies testified Santos told the police that Emanuel and Whitley said ' "they got rid of the phone" ' and suggested that Santos ' "report the phone lost." ' Santos told the police that Emanuel had had long dreadlocks when she dropped off their son with him that day, but when she returned that afternoon, he had cut off his dreadlocks.

"Destinee Kindle testified that she was Whitley's '[o]n, off' girlfriend in December 2012. On the evening of December 11, Whitley called Kindle and asked her to pick him up at Emanuel's house. Whitley told Kindle that he and Emanuel were involved in a shooting and showed her a news story about the shooting. Whitley explained that he was trying to rob someone of marijuana, and accidentally shot him in the neck though he intended to shoot him in the foot. Whitley told Kindle that Emanuel was with him when the shooting took place.

"Police interviewed Kindle on December 14, after Whitley was arrested at her house. On cross-examination, Kindle admitted that when police told her Whitley had shot someone, she pretended to be surprised by that because she 'didn't want to believe it [to be true].' Kindle told police that Whitley had not talked to her about the shooting.

"**2. The defense case**

"Whitley did not present any witnesses. Emanuel presented three witnesses but their trial testimony was not relevant to the issues addressed in the petition for resentencing, i.e., whether he was a major participant in the offense and acted with reckless disregard for human life.[11]" (*Emanuel*, *supra*, H049147, rev.gr. at pp. 2–8.)

---

[11] "Emanuel presented an expert in social psychology and psychological factors related to police interrogation techniques, a police detective who testified about Amini's (continued)

8

### *C. Direct appeal and proceedings on remand for resentencing*

On direct appeal from his conviction, Emanuel raised multiple claims of error, including that "the trial court erroneously denied Emanuel's request for probation with a multi-year jail term based on a mistaken belief about the relevant law; and [] Emanuel's sentence of 25 years to life is grossly disproportionate to his individual culpability and thus violates state and federal prohibitions on cruel and unusual punishment." (*Whitley*, *supra*, H043651 at p. 11.) Another panel of this court rejected Emanuel's other claims of error but concluded that the trial court "misunderstood the scope of its [sentencing] discretion under [*People v.*] *Bailey* [(1983) 140 Cal.App.3d 828]" and therefore reversed and remanded the matter for the trial court to "consider whether to exercise its discretion under *Bailey* to impose probation with a jail term that may exceed one year or 25 years to life in prison." (*Whitley*, *supra*, H043651at pp. 70, 72.) The *Whitley* court expressly stated that, because it was reversing Emanuel's sentence, it was not addressing his claim that his sentence of "25 years to life is grossly disproportionate to his individual culpability and thus violates state and federal prohibitions on cruel and unusual punishment." (*Id*. at p. 72, fn. 33.)

On remand, Emanuel's supplemental sentencing memorandum argued that his sentence of 25 years to life violated the state and federal constitutional prohibitions against cruel and unusual punishment. The prosecutor responded that Emanuel's cruel and unusual punishment claim exceeded the scope of this court's remand in Whitley and was forfeited as it was not raised at Emanuel's initial sentencing. In addition, the prosecutor argued that the claim lacked substantive merit given the circumstances of the murder.

---

identification of Emanuel, and Emanuel's mother, who testified he was home at the time of the shooting."

On April 5, 2021, the trial court conducted the hearing on remand. In that hearing, the trial court stated that it would deny Emanuel's claim that a sentence of 25 years to life was unconstitutionally cruel and unusual punishment regardless of whether that claim was beyond the scope of the remand. After going over the various factors that would militate in favor of and those that would militate against granting probation, the court denied probation and ruled that "[t]he original sentence would remain."

Emanuel timely appealed.

## II. DISCUSSION

Emanuel argues that his sentence of 25 years to life is disproportionate to his individual culpability for Cody's death and constitutes cruel and unusual punishment under the Eighth Amendment of the federal Constitution and article I, section 17, of the California Constitution. As explained below, we disagree.

### A. *Forfeiture*

We first address the question, raised by Emanuel in his opening brief, whether he has forfeited his constitutional argument by failing to raise it at his initial sentencing, and his associated argument that, if we find this claim forfeited, his trial counsel provided constitutionally ineffective assistance. The Attorney General, in his briefing, does not maintain that Emanuel has forfeited his cruel and unusual punishment argument. Because we use our discretion to resolve Emanuel's claim on the merits, we need not and will not address the issue of forfeiture and therefore also need not address the issue of ineffective assistance of Emanuel's trial counsel. (*People v. Urbano* (2005) 128 Cal.App.4th 396, 404.)

### B. *Beyond the scope of the remand*

The Attorney General argues Emanuel's claim is not cognizable on appeal because it exceeded the scope of the remand set forth in *Whitley*. The court in *Whitley* did not direct the trial court to conduct a full resentencing of Emanuel. Instead, the court

10

remanded the matter after concluding that the trial court "misunderstood the scope of its [sentencing] discretion under [*People v.*] *Bailey* [(1983) 140 Cal.App.3d 828]…." (*Whitley*, *supra*, H043651 at p. 70.)  Accordingly, on remand, the trial court was only asked to consider whether to exercise its discretion to impose probation with a county jail term that could exceed one year or let stand the original sentence of 25 years to life.  (*Id.* at p. 75.)

Emanuel argues that the remand was not restricted to the issue of the trial court's discretion to impose probation.  He points out that, as to his codefendant, the *Whitley* decision stated the following: "[T]he matter is remanded to the trial court for the limited purpose of exercising its discretion under section 12022.53, subdivision (h), to determine if Whitley's firearm enhancement should be stricken in the furtherance of justice.  If the trial court strikes Whitley's firearm enhancement, it shall resentence Whitley accordingly.  If the court declines to strike the firearm enhancement, the trial court shall reinstate the original sentence." (*Whitley*, *supra*, H043651 at pp. 75–76.)  However, as to his sentence, the *Whitley* opinion did not state that remand was for a "limited purpose" nor did it state that resentencing was predicated on how the trial court ruled on Emanuel's request for probation.  (*Id.* at p. 75.)

As noted above, we use our discretion to address Emanuel's constitutional challenge to his sentence on the merits and therefore we need not resolve this question. We will assume without deciding that Emanuel was permitted to raise this challenge on remand.

### C. Applicable law and standard of review

"Cruel and unusual punishment is prohibited by the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. Punishment is cruel and unusual if it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity.  [Citation.]"

(*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358, fns. omitted; see also *Ewing v. California* (2003) 538 U.S. 11, 20–23 (*Ewing*).)

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing, supra*, 538 U.S. at p. 20, quoting *Harmelin v. Michigan* (1991) 501 U.S. 957, 996–997.) " 'The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime. [Citations.]' " (*Ewing,* at p. 23.)[12]

California's Constitution imposes a similar standard. "[I]n California, a punishment may violate . . . the Constitution if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, superseded by statute on another ground, fn. omitted.) "The main technique of analysis under California law is to consider the nature both of the offense and of the offender. [Citation.] The nature of the offense is viewed both in the abstract and in the totality of circumstances surrounding its actual commission; the nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown

<hr />

[12] Emanuel concedes that the trial court's findings that he was a major participant in the robbery and acted with reckless indifference to human life acts to foreclose his federal Eighth Amendment challenge to his sentence as cruel and unusual. He raises the matter to preserve it for federal habeas review. As we noted in footnote 2, *ante*, the California Supreme Court is currently reviewing our prior opinion in which we concluded that substantial evidence supported the trial court's findings on this issue. (*Emanuel, supra*, H049147, rev.gr.) We address the underlying facts to the extent necessary to analyze whether Emanuel's punishment violates the Eighth Amendment under the proportionality principle described in *Ewing*, *supra*, 538 U.S. at pages. 20–23.

by such factors as age, prior criminality, personal characteristics, and state of mind. [Citation.]" (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494 (*Martinez*).)

The California Supreme Court has "distilled three analytical techniques to aid [a court's] deferential review of excessiveness claims: (1) an examination of the nature of the offense and the offender, with particular attention to the degree of danger both pose to society; (2) a comparison of the punishment with the punishment California imposes for more serious offenses; and (3) a comparison of the punishment with that prescribed in other jurisdictions for the same offense. [Citations.]" (*In re Palmer* (2021) 10 Cal.5th 959, 973 (*Palmer*).) "Disproportionality need not be established in all three areas." (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.) "Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment. [Citations.]" (*Martinez*, *supra,* 76 Cal.App.4th at p. 496.)

### D. Emanuel's sentence does not constitute cruel and unusual punishment

In this case, Emanuel's challenge is based on the first of the three prongs set forth in *Palmer*, *supra*, 10 Cal.5th 959. [13]  Citing *People v. Dillon* (1983) 34 Cal.3d 441

---

[13] Emanuel does not provide us with any information regarding the second or third analytical prongs for evaluating whether a particular sentence is unconstitutionally cruel and unusual, i.e., "a comparison of the punishment with the punishment California imposes for more serious offenses[,]" and "a comparison of the punishment with that prescribed in other jurisdictions for the same offense. [Citations.]" (*Palmer*, *supra*, 10 Cal.5th at p. 973.)  As to the second prong, there is no more serious offense under California law than first degree murder and, aside from premeditated first degree murder, there is nothing against which Emanuel can compare his punishment. (See, e.g., *People v. Brown* (1996) 42 Cal.App.4th 461, 478 [" 'murder has always been recognized as the most serious of crimes' "]; *Williams v. Superior Court* (1983) 34 Cal.3d 584, 593 ["murder [is] . . . one of the most serious offenses even when special circumstances are not alleged"].)  As to the third prong, even if Emanuel had cited case authority or statutes which showed that other states would have imposed a more lenient sentence for the same crime, this would not mandate reversal.  "This state constitutional consideration does not (continued)

(*Dillon*) and *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*), Emanuel argues that his sentence is disproportionate to his individual culpability. He was not the person who shot Cody, nor was there any evidence he possessed a weapon or even knew that Whitley was carrying a firearm before Whitley pulled it out. In addition, the evidence showed that Emanuel attempted to persuade Whitley to walk away when Cody refused to give up his marijuana, telling Whitley, " '[L]et's go.' " (*Emanuel*, *supra*, H049147, rev.gr. at p. 6.)

We think both *Dillon* and *Enmund* are inapposite to this case. The defendant in *Dillon* was "an unusually immature youth" of 17 when he committed the underlying offense for which he was sentenced to life imprisonment. (*Dillon*, *supra*, 34 Cal.3d at pp. 451, 487–488.) The California Supreme Court concluded that, due in large part to the defendant's age and immaturity, this sentence violated the California constitution's prohibition against cruel or unusual punishment (Cal. Const., art. I, § 17). (*Dillon*, *supra*, at p. 489.) It is well-established that the law imposes more restrictions on the punishment that may be meted out to juveniles than to adults. (See, e.g., *Miller v. Alabama* (2012) 567 U.S. 460, 471–472 (*Miller*) [recognizing that "children are constitutionally different from adults for purposes of sentencing" due to diminished capacity and greater prospects for reform].) Unlike the defendant in *Dillon*, Emanuel was not a juvenile.

*Enmund*, *supra*, 458 U.S. 782, is distinguishable in that the defendant in that case, a getaway driver for a planned robbery, was sentenced to death. (*Id*. at p. 785.) The U.S. Supreme Court noted that, under Florida law, it was "irrelevant … [that the defendant] did not himself kill and was not present at the killings; also beside the point was whether he intended that the [victims] be killed or anticipated that lethal force would or might be

---

require California to march in lockstep with other states in fashioning a penal code. It does not require 'conforming our Penal Code to the "majority rule" or the least common denominator of penalties nationwide.' [Citation.]" (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.)

14

used if necessary to effectuate the robbery or a safe escape." (*Id*. at p. 788.) The court found Enmund's sentence violated the Eighth Amendment because he "himself did not kill or attempt to kill" nor did the record "warrant a finding that Enmund had any intention of participating in or facilitating a murder." (*Id*. at p. 798.) Here, however, in addition to the fact that Emanuel was sentenced to 25 years to life, not death, Emanuel also was present during the armed robbery that culminated in Cody's death.

Emanuel points out that he was only 21 years old at the time of the murder and the United States Supreme Court has often indicated that a defendant's youth is an important factor to consider in the context of analyzing whether a punishment is cruel and unusual under the Eighth Amendment. Emanuel also notes that California has recognized the growing research on brain development in relation to decision making and amended the youth offender parole statute (§ 3051) to extend its application to those who committed their offenses when they were 25 years old and under. We are not persuaded.

As the trial court noted, Emanuel set up the meeting in which he and Whitley, having pretended to be interested in purchasing a large quantity of marijuana from Cody, would instead rob him. Emanuel was present when the attempted robbery took place but failed to intervene when Whitley pulled out a weapon, struck Cody in the head, and then shot him. Afterward, Emanuel made no effort to assist Cody or call for medical aid but fled the scene. Having reached a place of safety, Emanuel took additional steps to ensure that he would not be identified and arrested, e.g., cutting off his dreadlocks, getting rid of the phone that he used to set up the purported marijuana purchase, and instructing Santos to lie to police.

While there was evidence that Emanuel began to walk away and told Whitley " 'let's go' " when Cody refused to give up the marijuana, the sentencing court may very

15

well have rejected Santos's testimony on that subject.[14]  "The trial court is considered to be in the best position to conduct the resentencing hearing."  (*Peracchi v. Superior Court* (2003)  30 Cal.4th 1245, 1254.)  "[A] defendant's interest in a full and fair sentencing hearing usually is best served when the hearing is presided over by the same judge who heard the evidence at trial.  [Citations.]"  (*Id.* at p. 1261.)  In this case, the same judge who presided over Emanuel and Whitley's trial also presided over Emanuel's resentencing hearing.  It is undisputed that Emanuel had planned this robbery for two weeks (*Emanuel*, *supra*, H049147, rev.gr. at p. 2), enticing Amini and Cody with tales about buying the marijuana for an uncle in Las Vegas and offering well over market price.  (*Id.* at p. 3.)  Viewing these underlying facts in the light most favorable to the judgment (*Martinez*, *supra*, 76 Cal.App.4th at p. 496), it is clear that Emanuel's punishment is not so disproportionate to his individual culpability that it would violate the California Constitution's prohibition on cruel or unusual punishment (Cal. Const., art. I, § 17) or so " 'grossly disproportionate' " to Emanuel's crime that it would violate the Eighth Amendment (*Ewing, supra*, 538 U.S. at p. 23).

We are not persuaded by Emanuel's citation to various United States Supreme Court opinions[15] highlighting the importance of a defendant's youth in the context of an Eighth Amendment challenge.  These cases stand for the proposition that certain

---

[14] "*At trial*, 'it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 996.)  The trial judge, at Emanuel's resentencing, was similarly empowered to decide how much or little credence to give to the testimony of Emanuel's and Whitley's respective girlfriends, Santos and Kindle, both of whom either lied to or attempted to mislead the police during the investigation.

[15] Specifically, Emanuel cites *Roper v. Simmons* (2005) 543 U.S. 551, 568–570; *Graham v. Florida* (2010) 560 U.S. 48, 76; *Miller*, *supra,* 567 U.S. 460 at pages 473–474; and *Montgomery v. Louisiana* (2016) 577 U.S. 190, 210.

16

punishments may not be extended to *juveniles*, but do not stand for the proposition that an adult offender like Emanuel is similarly protected. (See, e.g., *People v. Perez* (2016) 3 Cal.App.5th 612, 617–618 [the functional equivalent of life without the possibility of parole is constitutional for a 20-year-old defendant]; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 [the functional equivalent of life without the possibility of parole is constitutional for an 18-year-old defendant].)

Emanuel was not sentenced to death or life without the possibility of parole nor was he a minor at the time he participated in the attempted robbery and fatal shooting of Cody. His sentence of 25 years to life, while lengthy, was not disproportionate to his culpability and does not amount to cruel and unusual punishment.

### III. DISPOSITION

The judgment is affirmed.

_____
WILSON, J.

WE CONCUR:



_____
BAMATTRE-MANOUKIAN, ACTING P. J.




_____
DANNER, J.



*The People v. Emanuel*
**H049190**